McCARTER & ENGLISH, LLP
J. Wylie Donald (JD2624)
Renée Anckner Gallagher (RA0078)
McCarter & English, LLP
245 Park Avenue, 27th Floor
New York, NY 10167
Tel: (212) 609-6800
Fax: (212) 609-6921

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GIUFFRE HYUNDAI LTD.,<br>GIUFFRE MOTOR CAR CO. LLC DBA<br>GIUFFRE KIA,<br>GIUFFRE AUTOGROUP LLC DBA<br>GIUFFRE MAZDA,<br>GIUFFRE AUTOMOTIVE INC. DBA<br>CHRYSLER JEEP DODGE & RAM,<br>GIUFFRE ITALIAN CARS INC. DBA<br>GIUFFRE FIAT | **CIVIL ACTION NO.:**<br>**1:13-CV-01777 (RA)** |

Plaintiffs,

v.

MAIDEN SPECIALTY INSURANCE
COMPANY, and MOTORS INSURANCE
CORPORATION (dba Ally Insurance)

Defendant.

**FIRST AMENDED
COMPLAINT AND
JURY DEMAND**



RECEIVED
JAN 23 2014
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiffs, Giuffre Hyundai Ltd., Giuffre AutoGroup LLC dba Giuffre Mazda, Giuffre

Motor Car Co. LLC dba Giuffre Kia, Giuffre Italian Cars Inc. dba Giuffre Fiat, and Giuffre

Automotive Inc. dba Giuffre Chrysler Jeep Dodge & Ram ("Giuffre" or "Plaintiffs"), by their

attorneys McCarter & English, LLP, allege the following for their Complaint based on personal

knowledge and on information and belief, as appropriate:

## NATURE OF THE ACTION

1.      In this action, Giuffre seeks damages and a declaration of insurance coverage under an insurance policy issued by Maiden Specialty Insurance Company ("Maiden") to Giuffre.

2.      Giuffre also seeks damages from Motors Insurance Corporation ("MIC"), general agent for Maiden; MIC made the underwriting decisions and handled Giuffre's claim and has tortiously interfered with Giuffre's contract with Maiden.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction under 28 U.S.C. § 1332 based on diversity of citizenship of the parties.  The amount in controversy exceeds $75,000.

4.      This Court has jurisdiction over Maiden because, upon information and belief, Maiden has been authorized to do business in the State of New York; Maiden has transacted significant business within New York by, among other things, doing a series of acts in New York for the purpose of pecuniary benefit, including but not limited to, contracting to insure persons, property and/or risks located within New York; and Maiden has sufficient contacts with the State of New York or otherwise to avail itself of the laws and markets of New York.

5.      This Court has further jurisdiction over Maiden because Maiden appointed the highest New York State official in charge of insurance affairs and his or her deputies as its "true and lawful attorney in and for the aforesaid State, upon whom all lawful process may be served in any action, suit or proceeding instituted in the said State by or on behalf of any insured or beneficiary against us, arising out of [the Policy]."

2

6.      Maiden consented to service of process by certified or registered mail to CT Corporation System, 111 Eighth Avenue, New York, NY 10011.

7.      This Court has jurisdiction over MIC because, upon information and belief, MIC has been authorized to do business in the State of New York; MIC has transacted significant business within New York by, among other things, doing a series of acts in New York for the purpose of pecuniary benefit, including but not limited to, acting as agent for Maiden in connection with its contracts to insure persons, property and/or risks located within New York; and MIC has sufficient contacts with the State of New York or otherwise to avail itself of the laws and markets of New York.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 in that Defendants are entities subject to personal jurisdiction in this District.

**THE PARTIES**

9.      Giuffre Hyundai Ltd. is an automobile dealer.  It is a corporation organized under the laws of the State of New York.  Its corporate offices are at 8825 5th Ave, Brooklyn, New York 11209.

10.     Giuffre Motor Car Co. LLC dba Giuffre Kia is an automobile dealer.  It is a limited liability company organized under the laws of the State of New York.  Its corporate offices are at 8825 5th Ave, Brooklyn, New York 11209.

11.     Giuffre AutoGroup LLC dba Giuffre Mazda is an automobile dealer.  It is a limited liability company organized under the laws of the State of New York.  Its corporate offices are at 8825 5th Ave, Brooklyn, New York 11209.

3

ME1 17060569v.4

12.     Giuffre Automotive Inc. dba Giuffre Chrysler Jeep Dodge & Ram is an automobile dealer.  It is a corporation organized under the laws of the State of New York.  Its corporate offices are at 8825 5th Ave, Brooklyn, New York 11209.

13.     Giuffre Italian Cars Inc. dba Giuffre Fiat is an automobile dealer.  It is a corporation organized under the laws of the State of New York.  Its corporate offices are at 8825 5th Ave, Brooklyn, New York 11209.

14.     On information and belief Maiden is an insurance company incorporated in North Carolina that, among other things, underwrites commercial property risks.  On information and belief its mailing address and principal place of business are 6000 Midlantic Drive, Suite 200 South, Mount Laurel, New Jersey 08054.  Maiden conducts its insurance business throughout the fifty United States.

15.     Maiden is registered with the New York State Department of Financial Services and authorized to write a wide variety of insurance, including Motor Vehicle and Aircraft Physical Damage.

16.     In exchange for the substantial premiums received from Giuffre, and in full payment thereof, defendant Maiden sold Giuffre Policy No. PMINT5000845-12 (the "Policy"), styled Motors Inventory Coverage, effective May 9, 2012 to May 9, 2013.

17.     Giuffre Hyundai Ltd., Giuffre AutoGroup LLC dba Giuffre Mazda, Giuffre Motor Car Co. LLC dba Giuffre Kia, Giuffre Italian Cars Inc. dba Giuffre Fiat, and Giuffre Automotive Inc. dba Giuffre Chrysler Jeep Dodge & Ram are insured under the Policy.

4

18.     Among other things, the Policy provided coverage for loss by a covered peril to the automobiles acquired by Giuffre for lease or sale.

19.     On information and belief MIC is an insurance company incorporated in Michigan that, among other things, underwrites commercial property risks.  MIC also acts as an agent for Maiden on certain insurance policies, including the Policy.  On information and belief MIC's mailing address and principal place of business are 300 Galleria Officentre, Suite 200, Southfield, Michigan, 48034. MIC conducts its insurance business throughout the fifty United States.

20.     On information and belief MIC was responsible for the decisions made by Maiden on how to write Giuffre's policy with Maiden.

21.     On information and belief MIC was responsible for the decisions made by Maiden on how to pay Giuffre's claim and how not to pay Giuffre's claim.

22.     Giuffre has no contractual relationship with MIC.

## FACTUAL ALLEGATIONS

### The Storm

23.     The 2012 Atlantic Hurricane Season started on June 1, 2012.

24.     The National Oceanic and Atmospheric Administration ("NOAA") tracks developing tropical depressions.

25.     When such depressions develop sufficient strength, the storm is given a name.

5

26.     On October 22, 2012, NOAA identified a storm developing in the Caribbean Sea and named it "Sandy."

27.     Sandy developed into a hurricane and traveled north along the Atlantic seaboard of the United States.

28.     On October 29, 2012 Sandy was downgraded from "hurricane" to "post-tropical cyclone."

29.     Concurrent with Sandy's travel north, other severe weather developed over Canada.  Additionally, a high pressure front stalled near Greenland.

30.     As a result, Sandy veered from its northeast track and made landfall in New Jersey and then New York.

31.     Notwithstanding its downgrading from hurricane status, the combination of Sandy with the severe weather conditions arriving from Canada resulted in a "superstorm" – Superstorm Sandy.

32.     Giuffre undertook preparations for Sandy.

33.     Among other things, it considered its storage facility located at 29th Street and Second Avenue, Brooklyn, where Giuffre stored some of its inventory of cars (the "Storage Lot").

34.     Some cars were moved to the showrooms.  Other cars were moved away from the pier.

6

35.     However, Sandy delivered an unprecedented storm surge to the New York City area on October 29, 2012.

36.     Reuters reported that the storm surge at Battery Park exceeded the previous record by almost 4 feet.

37.     The storm surge also overtopped the Storage Lot.

38.     The surge swamped 358 vehicles held by Giuffre as inventory on the Storage Lot.

39.     Each of the damaged vehicles was subject to a security interest held by one of Giuffre's lenders.

40.     Maiden ultimately found that each of the swamped vehicles on the Storage Lot was covered and was a Total Loss under the Policy.

**The Policy**

41.     The Policy is comprised in pertinent part of a Declarations page, form I/ES 01(09-09) (containing copyrighted material of the Insurance Services Office) (the "Policy Form") and various endorsements.

42.     As provided in the Policy materials Maiden believes its "program is 'best in class' in terms of coverage, value and claims handling."

43.     The Policy provides a variety of coverages as set forth on the Declarations page, including something referred to as "Inventory Comprehensive."

7

44.     As stated on the Declarations page for Inventory Comprehensive coverage the "Per Vehicle Deductible All Locations" is $2,500 and the "Aggregate Comprehensive Deductible" is $5,000.

45.     Additionally, "Weather Deductibles" are stated to be $2,500 "Per Covered Auto" and $5,000 "Per Loss Aggregate."

46.     An endorsement on the Policy provides that various locations where Giuffre conducts its business are covered by the Policy, including the Storage Lot.

47.     "Comprehensive" under the Policy (Policy Form ¶ I.E) means "**loss**, unless excluded, to a **covered auto** from any cause of **loss**, other than **loss** due to **collision** or **loss** due to **false pretense**."

48.     A "Covered Auto" under the Policy (Policy Form ¶ I.F.1) is a "land motor vehicle … which you [Giuffre] own."

49.     "Inventory" under the Policy (Policy Form ¶ I.K) means "a **covered auto** that is neither a **demonstrator** nor a **shop rental** vehicle."

50.     Under the Policy (Policy Form ¶ I.S) a "Weather Loss" includes "any and all causes of **loss** due to a weather condition including … flood, …, tidal surge, … hurricane, tropical storm, tropical depression and rain."

51.     "Wholesale Value" under the Policy (Policy Form ¶ T.1.d.) means "the amount of the dealer invoice.  Finance and insurance charges, advertising expenses, and any model changeover credits are excluded from **wholesale value**."

52.     Under the Inventory Comprehensive coverage in the Policy (Policy Form ¶
II.A.1) Maiden agreed to "pay for **loss** … unless excluded, to a **covered auto** from any cause
except [certain non-applicable causes]."

53.     In the event of a total loss to a covered auto, Maiden agreed under the Policy
(Policy Form ¶ II.C.4.a.) to pay the "wholesale value" of the vehicle.

54.     With respect to a Weather Loss, the Policy (Policy Form ¶ II.D.2.a.) provides that
"The amount of **loss** to each **covered auto** resulting from any **weather loss** will be reduced by
the Weather Per Vehicle Deductible shown on the Declarations."

55.     The Policy (Policy Form ¶ II.D.2.b.) further provides with respect to a Weather
Loss, that "Regardless of the number of **covered autos** involved in the **weather loss**, the
Weather Per Loss Aggregate Deductible shown in the Declarations is the maximum deductible
applicable to all **loss** in any one event caused by a **weather loss** condition unless no aggregate is
shown on the Declarations applicable to **weather**.  When no aggregate is shown in the
Declarations, the amount of **loss** will be reduced by the Weather Per Vehicle Deductible."

56.     Certain endorsements on the Policy address various lenders with security interests
in some or all of Giuffre's inventory.

57.     These "Loss Payees" (as referred to in the Policy) include Ally Bank/Ally
Financial, Kia Motor Finance Co., Mitsubishi Motors Credit of America, and Hyundai Capital
America.

9

58.     Each Loss Payee endorsement provides in pertinent part that the "endorsement changes the policy on the inception date of the policy" and that the endorsement "modifies insurance provided under the AUTOMOBILE PHYSICAL DAMAGE Policy Form."

59.     Further, "[w]ith respect coverage provided by this endorsement, the provisions of the Policy Form apply unless modified by the endorsement."

60.     The coverage provided under each Loss Payee endorsement is in pertinent part as follows: "A. For **covered autos** in which you and a loss payee have an insurable interest, we will pay, as interest may appear, you and the loss payee named for **loss** to a **covered auto** up to the limits of insurance and deductibles applicable as follows:

| Coverage | Per Vehicle Deductible All Locations | Aggregate Comprehensive Deductible | Limit of Insurance |
|---|---|---|---|
| **Inventory Comprehensive** | $2,500 | $5,000 | $18,835,051 |
| ... | | | |
| **Weather   Deductible   (All Covered Autos)** | $2,500 | $5,000 | |

61.     Each Loss Payee endorsement further provides that "B.  The insurance covers the interest of the loss payee unless the **loss** results from conversion, secretion or embezzlement on your part."

62.     Following the inception of the Policy on May 9, 2012, Giuffre's broker issued a certificate of insurance confirming the deductible to be applied to claims involving Loss Payees.

63.     The Certificate of Liability Insurance, prepared on May 22, 2012 for Ally Financial/Ally Bank as Certificate Holder, stated:  "Weather Deductible; $2,500 per Auto 5,000 Aggregate."

10

**The Claim**

64.     Following the damage to its vehicle inventory at the Storage Lot from Sandy, Giuffre filed a claim with Maiden and an adjuster was assigned.

65.     The adjuster identified 358 vehicles that had been damaged, determined that each vehicle was covered under the Policy and was a total loss, and calculated each vehicle's "wholesale value" so as to determine the amount due to Giuffre.

66.     In so doing, and contrary to the requirements of the Policy, a $2,500 deductible was applied to each vehicle, rather than capping the aggregate deductible at $5,000 as was required under the Loss Payee endorsements.

67.     This process was followed even though Maiden understood that the Loss Payees had insurable interests in the damaged vehicles.

68.     Additionally, in the calculation of wholesale value for each vehicle certain deductions were taken from the dealer invoice that were not included on the dealer invoice.

69.     Maiden then offered to pay the claim applying a non-aggregated deductible and applying various deductions from the dealer invoice, which were not shown as included on the dealer invoice.

70.     In order to be paid the undisputed amounts, Maiden requested that Giuffre execute a Loss and Damage Statement that provided:

> The sole purpose of this instrument is to fix and evidence the total amount for which claim is made. This instrument is, and is intended, to be binding as to the total amount of loss or damage said to have occurred under the Policy.

11

71.    Giuffre refused to sign the Loss and Damage Statement provided by Maiden.

72.    Ultimately Maiden paid Giuffre the undisputed amounts due under the Policy.

73.    Giuffre challenged the application of the deductible provision but Giuffre's position was rejected by Maiden.

74.    On December 20, 2012, Maiden's claim representative wrote:  "we have concluded our review of your concern regarding deductible application and have determined the special weather flood loss deductible as indicated on the Flood Deductible Endorsement is the applicable deductible for this loss."

75.    In its representative's letter of December 20, 2012 Maiden did not address the Loss Payee endorsements and their clear and unequivocal terms concerning the Weather Deductible and the aggregate deductible.

76.    Nor did the letter acknowledge that the endorsements state that "the insurance covers the interest of the loss payee unless the loss results from conversion, secretion or embezzlement" on Giuffre's part.

77.    Maiden has never claimed that the storm surge arising from Sandy had anything to do with conversion, secretion or embezzlement on Giuffre's part.

78.    The amount claimed by Giuffre for the deductibles improperly applied by Maiden is $890,000.

79.    Maiden's representative also took deductions from the dealer invoice for costs that were not included on the dealer invoice.

80.    For example, with respect to Chrysler Dealer Invoice D-RTY-27260997 for VIN 2C4RC1CG3DR512179, the total "Dealer Cost" was $34,320 but this was reduced by "SFPAP $305", a value not shown on the dealer invoice and not included in the Dealer Cost.

81.    As another example, with respect to Hyundai Dealer Invoice EA01074683 for VIN 5NPEC4ACXDH613121, the total "Dealer Cost" was $27,041, but this was reduced by "FA $291" even though the FA was not included in the Dealer Cost on the invoice.

82.    As another example, with respect to Mazda Dealer Invoice 0011652950 for VIN 5XXGR4A6XDG129219, the total "Dealer Cost" was $29,255, but this was reduced by "Finance Credit" $330.35, a value not shown on the dealer invoice and not included in the Dealer Cost.

83.    As another example, with respect to Kia Dealer Invoice 2012040315154 for VIN JM3TB3CV3C0357586, the total "Dealer Cost" was $32,049, but this was reduced by "DMG Contribution" $290, a value shown on the dealer invoice but not included in the costs excluded by the definition of "wholesale value".

84.    Maiden applied these and other similar discounts to the Dealer Cost as set forth on the dealer invoices for the 354 other damaged vehicles contrary to the terms of the Policy.

85.    Giuffre challenged the application of these deductions but its position was rejected by Maiden.

86.    The amount claimed by Giuffre for the deductions improperly applied by Maiden is approximately $100,000.

87.    Accordingly, Maiden has not honored its obligations under the Policy

13

88.     On information and belief, in all of the above activities MIC has guided or directed Maiden, notwithstanding that Giuffre has no contractual relationship with MIC.

89.     Indeed, Maiden has asserted in papers filed in this lawsuit that: "MIC and Maiden entered into what is called a "fronting arrangement" whereby Maiden issues Motors Inventory Coverage policies in New York which are then completely reinsured by MIC, which is then responsible for all underwriting and claims decisions. ... Accordingly, MIC (under the trade name Ally Insurance) made all of the underwriting and claims decisions in connection with the Policy during the 2010 to present time period and is wholly responsible for any claims arising thereunder."

**Consequential Damages**

90.     Because Maiden has refused to honor its obligations under the Policy, Giuffre is being charged interest on the unpaid portion of the loans made by its lenders.

91.     By way of example, Ally Bank is charging 4.25% per annum on over $400,000 that remains due.

92.     As another example, because of its cash shortfall, Giuffre was forced to halt construction at its property at 8904 5th Avenue, Brooklyn.  As a result Giuffre cannot complete the building, obtain a certificate of occupancy, and either lease the building or turn it to Giuffre's own uses.  Giuffre is sustaining an ongoing and increasing loss on the building.

93.     As another example, because of its cash shortfall, Giuffre cannot consolidate its service departments which currently operate out of two locations at a loss.  Were they to be combined, they would operate at a profit.

ME1 17060569v.4

94.    Giuffre has incurred and may incur other damages as a result of Maiden's insistence on non-aggregated deductibles and improperly applied deductions from wholesale value.

**Legal Fees**

95.    Giuffre has incurred legal fees and expenses in excess of $75,000 in pursuing Maiden and expects to incur substantial additional fees and expenses to prosecute its claim.

## FIRST COUNT
### (Breach Of Contract)

96.    Giuffre hereby incorporates the allegations contained in paragraphs 1 through 95 as if set forth in full herein.

97.    Under the terms of the Policy sold to Giuffre, Maiden has an obligation to pay Giuffre for its loss as a result of Superstorm Sandy.

98.    Despite demand, Maiden has failed to acknowledge and has refused to satisfy all of its obligations under the Policy.

99.    Among other things, Maiden has refused to:

    a.  Apply the deductible applicable to Loss Payees for weather-related loss.

    b.  Pay the full wholesale value of the damaged vehicles as set forth on the dealer invoices.

100.    In so failing and refusing, Maiden has breached its contractual obligations to Giuffre.

101.    Giuffre has properly performed all of the obligations required under the Policy.

ME1 17060569v.4

102.   As a direct and proximate result of Maiden's breach of its contractual obligations, Giuffre has suffered compensatory and consequential damages, the precise amount of which will be determined at trial.

WHEREFORE, Giuffre respectfully requests that the Court enter judgment against defendant Maiden and in favor of plaintiffs, and grant the following relief:

      (a)    award plaintiffs compensatory and consequential damages in an amount to be determined at trial;

      (b)    award plaintiffs their costs, expenses and attorneys' fees incurred herein, and pre- and post- judgment interest; and

      (c)    grant such other and further relief as the Court deems just and proper.

## SECOND COUNT
### (Declaratory Judgment)

103.   Giuffre repeats and realleges each and every allegation contained in Paragraphs 1 through 102 as if fully set forth herein.

104.   Under the terms of the Policy, Maiden has an obligation to pay Giuffre for its loss as a result of Superstorm Sandy.

105.   Giuffre has timely notified Maiden and has properly performed all of the obligations required under the Policy.

106.   Despite demand, Maiden has failed to acknowledge, and has refused to satisfy, all of its obligations under the Policy.

107.   There is an actual and present controversy between Giuffre and Maiden over the obligations of Maiden to pay Giuffre for its loss as a result of Superstorm Sandy.

ME1 17060569v.4

108.    This Court is vested by the Uniform Declaratory Judgments Act with the power to declare the rights and liabilities of the parties and to give such further and other relief as may be necessary.

WHEREFORE, Giuffre respectfully requests that the Court enter judgment against defendant Maiden and in favor of plaintiffs and grant the following relief:

     (a)    declaring that plaintiffs are entitled to payment under the Policy for any costs, expenses and/or loss that they have incurred or may incur in the future in connection with Superstorm Sandy;

     (b)    adjudging, determining and declaring that plaintiffs are entitled to the costs and disbursements of this action, including but not limited to reasonable attorneys' fees and pre- and post- judgment interest; and

     (c)    grant such other and further relief as the Court deems just, proper and equitable.

## THIRD COUNT
### (For Breach of Duty of Good Faith and Fair Dealing)

109.    Giuffre repeats and realleges paragraphs 1 - 108 as if fully set forth herein.

110.    By selling the Policy to Giuffre, Maiden assumed a duty of good faith and fair dealing toward Giuffre.

111.    The Policy contained an implied promise that Maiden would conduct itself fairly and with due care, diligence, and in good faith and in an open and honest manner toward Giuffre and would do nothing to injure, frustrate or interfere with Giuffre's rights to receive the benefits of the Policy.

17

ME1 17060569v.4

112.    Maiden has breached its duty of good faith and fair dealing toward Giuffre.

113.    Maiden has failed to pay in good faith Giuffre for all of its loss as a result of Superstorm Sandy.

114.    Maiden has failed to evaluate Giuffre's rights and Maiden's obligations under the Policy in good faith.

115.    Maiden has asserted spurious and unsupported reasons as the basis for its failure to pay all of the damages relating to the vehicles damaged by Superstorm Sandy and has also failed to provide to Giuffre the full benefits of the Policy without unreasonable delay when there is no just reason to fail to provide those benefits.

WHEREFORE, Giuffre respectfully requests that the Court enter judgment against defendant Maiden and in favor of plaintiffs, and grant the following relief:

    (a)    award plaintiffs compensatory and consequential damages in an amount to be determined at trial;

    (b)    award plaintiffs their costs, expenses and attorneys' fees incurred herein, and pre- and post- judgment interest; and

    (c)    grant such other and further relief as the Court deems just and proper.

## FOURTH COUNT
### (Negligent Writing of the Policy)

116.    Giuffre repeats and realleges paragraphs 1 - 115 as if fully set forth herein.

117.    Giuffre has no contractual or other relationship with MIC.

ME1 17060569v.4

118.    On information and belief, MIC has made all underwriting decisions in connection with the Policy.

119.    Those decisions resulted in a contract that was ambiguous on its face causing, and continuing to cause, Giuffre to expend substantial sums to resolve the ambiguity.

120.    In choosing to make the underwriting decisions on the Policy, MIC undertook a duty to Giuffre to conduct itself with due care and to write a policy that was clear on its face and not ambiguous.

121.    MIC negligently or recklessly wrote the Policy so that it was not clear on its face, in breach of its duty.

122.    As a result of MIC's negigence or recklessness in writing the contract between Giuffre and Maiden, Giuffre has incurred direct damages in the form of its legal costs and expenses in pursuing Maiden.

123.    As a result of MIC's negligence or recklessness in writing the contract between Giuffre and Maiden, Giuffre has incurred consequential damages including interest, lost opportunities and lost income.

WHEREFORE, Giuffre respectfully requests that the Court enter judgment against MIC and in favor of plaintiffs, and grant the following relief:

(a)    award plaintiffs compensatory and consequential damages in an amount to be determined at trial;

ME1 17060569v.4

(b)     award plaintiffs their costs, expenses and attorneys' fees incurred herein,

and pre- and post- judgment interest; and

(c)     grant such other and further relief as the Court deems just and proper.

**FIFTH COUNT**
**(For Tortious Interference with a Contract)**

124.    Giuffre repeats and realleges paragraphs 1 - 123 as if fully set forth herein.

125.    Giuffre has no contractual or other relationship with MIC.

126.    On information and belief, MIC has made all claims decisions in connection with Giuffre's claim, including the spurious and unsupported decisions to not aggregate deductibles and to inject improper deductions from the wholesale value.

127.    As a result of MIC's tortious interference with the contract between Giuffre and Maiden, Giuffre has incurred direct damages in the form of its legal costs and expenses in pursuing Maiden.

128.    As a result of MIC's tortious interference with the contract between Giuffre and Maiden, Giuffre has incurred consequential damages including interest, lost opportunities and lost income.

WHEREFORE, Giuffre respectfully requests that the Court enter judgment against MIC and in favor of plaintiffs, and grant the following relief:

(a)     award plaintiffs compensatory and consequential damages in an amount to

be determined at trial;

20

(b)      award plaintiffs their costs, expenses and attorneys' fees incurred herein,

and pre- and post- judgment interest; and

(c)      grant such other and further relief as the Court deems just and proper.

ME1 17060569v.4

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiffs demand judgment in their favor against Maiden and MIC:

A)      Declaring, pursuant to the terms of the Policy, that Maiden is obligated to indemnify plaintiffs for the loss arising from Superstorm Sandy;

B)      a) For money damages from Maiden, not limited to the Policy limits, and including direct, compensatory and consequential damages, together with pre-judgment and post-judgment interest; b) for money damages from MIC, including the cost of pursuing Maiden, and other direct, compensatory and consequential damages, together with pre-judgment and post-judgment interest.

C)      For costs of suit;

D)      For counsel fees; and

E)   .   For such and other further relief as the Court may deem just and proper.

ME1 17060569v.4

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule 38(b), Plaintiffs hereby demand a jury trial on all issues so triable that are raised by this Complaint.

Dated: January 23, 2014

McCARTER & ENGLISH, LLP

By: _____
J. Wylie Donald (JD2624)
Renée Anckner Gallagher (RA0078)

245 Park Avenue, 27th Floor
New York, NY  10167
Tel: (212) 609-6800
Fax: (212) 609-6921
Jdonald@mccarter.com
*Attorneys for Plaintiffs*
*Giuffre Hyundai Ltd., Giuffre AutoGroup LLC*
*dba Giuffre Mazda, Giuffre Motor Car Co.*
*LLC dba Giuffre Kia, Giuffre Italian Cars Inc.*
*dba Giuffre Fiat, and Giuffre Automotive Inc.*
*dba Giuffre Chrysler Jeep Dodge & Ram*

TO:

George Richard Dodge
Allison Joan Zolot
Mayer Brown LLP
1675 Broadway
New York, NY 10019
*Attorneys for Defendant*
*Maiden Specialty Insurance Company*

MOTORS INSURANCE CORPORATION
(dba Ally Insurance)
300 Galleria Officentre, Suite 200
Southfield, Michigan 48034

ME1 17060569v.4